**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| MICHAEL LLOYD HANSON, | ) | |
| | ) | |
| Plaintiff, | ) | No. 10 C 500 |
| | ) | |
| v. | ) | Magistrate Judge Mason |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

MICHAEL T. MASON, United States Magistrate Judge.

Claimant Michael Lloyd Hanson ("Hanson" or "claimant") brings this motion for summary judgment [23] seeking judicial review of the final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Hanson's claim for disability insurance benefits under Sections 216 and 223 of the Social Security Act (the "SSA"), 42 U.S.C. §§ 416(I) and 423(d), and his claim for supplemental security income under Section 1614(a)(3)(A) of the SSA, 42 U.S.C. § 1382a(a)(3)(A). The Commissioner filed a cross-motion for summary judgment [34], requesting that this Court uphold the decision of the Administrative Law Judge ("ALJ"). This Court has jurisdiction to hear this matter pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). For the reasons set forth below, claimant's motion for summary judgment [23] is granted and the Commissioner's cross-motion for summary judgment [34] is denied.

# I. BACKGROUND

## A. Procedural History

On March 28, 2007, Hanson filed applications for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI").  (R. 106-118).  His applications were initially denied on September 25, 2007.  Hanson filed a timely request for a hearing, which was held on January 27, 2009 before Administrative Law Judge Joel G. Fina (the "ALJ").  On March 5, 2009, the ALJ issued a written decision denying Hanson's request for benefits.  (R. 45-52).  Hanson filed a timely Request for Review, and on December 3, 2009, the Appeals Council denied this request, which made the ALJ's decision the final decision of the Commissioner.  (R. 1); *Estok v. Apfel*, 152 F.3d 636, 637 (7th Cir. 1998); 20 C.F.R. § 416.1481.  Hanson subsequently filed this action in the District Court.

## B. Medical Evidence

Claimant seeks DIB and SSI for disabling conditions stemming from discogenic and degenerative disorders of the spine, lumbar radiculopathy, obesity, and essential hypertension.  (R. 47).  He claims he sustained a back injury after lifting a 50 pound cement block while working in a warehouse.  (R. 48).  He alleges an onset of disability of July 5, 2005.  (R. 45).

### 1. Will-Grundy Medical Clinic

On January 27, 2005, before he suffered his back injury at work, Hanson visited Will-Grundy Medical Clinic, a free clinic, complaining of lower back pain.  (R. 525).  At Will-Grundy, he was diagnosed with high blood pressure and instructed to take Aleve for his pain.  *(Id.)*  A report dated April 21, 2005 states that Hanson claimed "[l]ow back pain especially when standing going down. [Right] leg.  Had an old injury 30 yrs ago – starting to hurt again."  (R. 546).  Hanson returned with the same complaint on May 25,

June 23 and July 7, 2005, with pain in his lower back and radiating down his right leg. (R. 548). Hanson was prescribed a variety of medications to help with the pain and hypertension. (R. 569).

On December 15, 2005 and several times in 2006, Hanson visited the clinic for check-ups. The December 15, 2005 report states "feels good except for back." (R. 550). A September 1, 2006 report states that Hanson suffers from back pain and a herniated disc, and that he cannot exercise due to the pain. (R. 551).

### 2. Will County Medical Associates, S.C.

Hanson was examined by Dr. Michael Dorning at Will County Medical Associates on August 22, 2005. (R. 235). After assessing the claimant's reflexes and x-rays, Dr. Dorning determined that Hanson suffers from "L5/S1 spondylolisthesis with right-sided radiculopathy." (*Id.*) The report stated: "He can forward flex to about 80 degrees then complains of pain radiating down his right leg into his right calf area. Exam...reveals patellar and Achilles tendon reflex to be +2/4 bilaterally. It appears he has a positive straight leg raise on the right in both the seated and supine position." (*Id.*) Dr. Dorning ordered an MRI, which was conducted at Open Advanced MRI on September 29, 2005.

Hanson saw Dr. Dorning again on October 11, 2005 to review the results of the MRI. (R. 238). The MRI revealed "degenerative disc disease with foraminal stenosis at L5-S1 and lateral recess stenosis at L4-5. There are multiple level disc bulges, but no evidence of disc herniation or nerve root impingement." (*Id.*) The report states that Hanson can "forward flex to 90 degrees...but does complain of some pain in his lower back." The final assessment was "[l]umbar degenerative disc disease with lumbar spondylosis." (*Id.*) Dr. Dorning recommended that Hanson continue with physical

therapy three times weekly for two weeks and that he return to work, but not lift anything more than 15 pounds with occasional bending but no squatting.  (*Id.*)

Dr. Dorning examined Hanson again on October 27, 2005.  (R. 240).  At this visit, the physical examination showed that Hanson's condition had not changed.  (*Id.*)  Dr. Dorning restricted Hanson to "no lifting over 20 pounds with occasional bending and squatting."  (R. 241).

### 3. Open Advanced MRI

Dr. Thomas A. Predey of Open Advanced MRI also reviewed Hanson's MRI results, and reported degenerative disc and facet joint disease.  (R. 230).  Specifically, he found "[m]oderate bilateral, symmetric neuroforaminal stenosis at L5-S1.  Mild bilateral lateral recess stenosis at L3-4.  Mild posterior disc bulging at L5-S1, L4-5, and T12-L1 and L1-2 levels."  (*Id.*)

### 4. Athletic and Therapeutic Institute

Hanson underwent physical therapy between October 20, 2005 and November 28, 2005 at Athletic and Therapeutic Institute.  (R. 248-277).  His physical therapist reported that there was some improvement in Hanson's condition as a result of the therapy, and that Hanson was likely to continue to improve with more therapy, but that the pain might be prohibitive.  (R. 248).  During therapy, the claimant complained of pain amounting to an 8 out of 10 (10 being emergency room worthy pain).  (*Id.*)  His therapist also noted that he was able to carry two 40 pound weights, and could flex fully to the floor to remove tubing from his ankles, but only 2 inches inferior patella when formally tested.  (*Id.*)

On December 19, 2005, Matthew Kruger (a key certified functional assessment

specialist with Athletic and Therapeutic Institute) performed a Functional Capacity Assessment ("FCA"). The FCA demonstrated that Hanson was capable of light to medium physical exertion in the occupational setting. (R. 251). This level of exertion would allow Hanson to do some "occasionally lifting and carrying between 30-50 lbs, with frequent lifting and carrying approximately 20 lbs." (*Id.*) Mr. Kruger noted that Hanson "reported increased right sided low back pain and right leg pain with nearly every FCA activity." (*Id.*) As a result, the report states: "most activities are recommended on an occasional basis only at this time." (*Id.*) During the assessment, Hanson stated: "The pain in my back never goes away and sometimes the pain gets really bad depending on what I do." *(Id.)*

The FCA also stated that for an 8 hour work day, Hanson could tolerate the following: sit for 5-6 hours (45 minute durations, regular breaks), stand for 4 hours (45 minute durations, regular breaks) or walk for 3-4 hours (occasional, moderate distances). (R. 253). In addition, he could occasionally bend, squat, crawl, climb stairs, crouch, kneel, and balance. (*Id.*) The report also noted that Hanson could occasionally handle weight above 30 pounds, and could frequently handle weight in the 20-30 pound range, and that he could occasionally grasp items with his feet, and frequently with his hands. (R. 254).

### 5. South Chicago Orthopedics

On November 9, 2005, Hanson was examined by Dr. Blair Rhode at South Chicago Orthopedics. (R. 282). Dr. Rhode reported his belief that claimant's injury was not just the result of one isolated event at work, but rather that the pain is more likely a strain "superimposed on significant lumbar degenerative disk disease." (R. 283). Dr.

Rhode noted that Hanson complained of pain that radiates from his low back to the dorsum of the right foot. (*Id.*) Dr. Rhode diagnosed Hanson with acute lumbar back pain with right lumbar paraspinous spasm and right L4-5 facet symptoms. He noted that Hanson had tenderness to palpation along the right lumbar paraspinous muscles and pain with extension and right lateral bend. (R. 283). He also found there was "no clinical evidence of radiculopathic findings." (*Id.*) He noted that Hanson had pain during forward flexion, but "provocative maneuvers are normal, including negative straight leg raise." (*Id.*) He stated that some of claimant's subjective symptoms are worse with standing or walking, which would "suggest posterior element pain (facet symptoms) or spinal stenosis." (*Id.*)

In addition, Dr. Rhode reported: "I do not feel that the claimant should require permanency for this work injury. If the claimant is unable to return to a full, unrestricted position, I do not feel that it is due to his single lifting event after he was on this job for 1 week. Rather, I feel it is due to his morbid obesity superimposed upon his significant multilevel degenerative disk/facet disease." (R. 284). He noted that it would be difficult to rehabilitate Hanson because of his morbid obesity. (*Id.*) He suggested that Hanson be placed on modified light duty for four to six weeks, allowing him to lift 10-20 pounds, waist to shoulders, and in a sedentary position with breaks every two hours. (R. 284).

Hanson had a follow-up visit with Dr. Rhode on January 30, 2006. (R. 286). Dr. Rhode reiterated his belief that the injury is not the underlying cause of his pain, but was just an aggravation of a degenerative condition. (R. 289). With respect to work status, Dr. Rhode reported that claimant's significant body mass and back pain require "modified duty-light." (R. 288).

**6. Morris Hospital and Health Center**

Hanson first visited Morris Hospital and Health Center on August 2, 2005. (R. 384-388). After some preliminary evaluations of Hanson's complaints, he was prescribed two weeks of physical therapy. (R. 390). His physical therapist noted that Hanson had a positive straight leg raise test with increased low back pain bilateral, and that there was increased low back pain with extension and flexion and palpable tightness along the right side of the spine. (*Id.*) On August 16, 2005, after two weeks of therapy, the physical therapist noted that the therapy had resulted in no change in Hanson's pain or tingling and numbness. (R. 391). Again, Hanson had a positive straight leg raise test, he experienced pain with flexion and extension, and palpable tightness along his spine. (*Id.*)

Hanson visited the Pain Management Center at Morris Hospital on March 6, 2006. (R. 396). The reports from this visit note that his pain is "continuous made worse by standing, walking. No pain medication is currently taken but still has difficultly ambulating due to pain. He has been in a physical therapy program for about eight weeks, however this seemed to make it worse." (*Id.*) The diagnosis from this visit was "1. Chronic right lumbosacral radiculopathy (pain, numbness), secondary to disc protrusion, foraminal stenosis. 2. Moderate bilateral foraminal stenosis, mild disc protrusion at L5-S1; mild disc protrusion at L4-L5." (*Id.*) To help with the pain, Hanson received a series of three epidural steroid injections in his spine. (*Id.*) These occurred during visits dated March 8, March 22, and April 5, 2006. (R. 292-97).

Hanson returned to Morris Hospital on May 2, 2006, complaining of an accelerated heartbeat. (R. 442). He was examined by two physicians (Dr. Jones and

Dr. Aziz), both of whom diagnosed the claimant with hypertension, obesity, and degenerative joint disease. (R. 442-45).

### 7. Hinsdale Orthopaedic Associates

Hanson visited Hinsdale Orthopaedic Associates on October 13, 2005. (R. 348). Upon examination, he was found to be morbidly obese, with disc degeneration and symmetrical foraminal stenosis. (*Id.*) The examining physician also noted "[s]pondylolysis at L5-S1 along with a disc herniation and some radiculopathy secondary to a lifting incident." (*Id.*) It was also noted that his reflexes are normal and there was no atrophy, but range of motion in his back was limited and produced significant pain. (*Id.*) The physician ordered that Hanson not work, and Hanson was given a prescription for Vicadin and a Medrol Dose pack. (*Id.*) Hanson was also referred to a rehabilitation program, and he was given a referral for a weight loss program as part of the therapy regimen for his back pain. (*Id.*)

Hanson returned for a follow up evaluation on December 1, 2005, at which time the physician noted continued lower back pain, radicular irritation and spondylolysis. (R. 347). Hanson again returned on January 19, 2006 and was again diagnosed with spondylolisthesis with radiculopathy. (R. 345). The treating physician recommended that Hanson return to work within the parameters of the December 15, 2005 FCA "with maximum lifting of about 20 lbs with no repetitive bending." (*Id.*) The report also noted: "This is a permanent restriction. He may not return to work as a warehouseman. He is at maximum medical improvement." (*Id.*)

Hanson again visited Hinsdale Orthopedics on May 25, 2006. (R. 344). He still complained of back pain, stating that the epidural steroid injections helped for only short

periods of time. (*Id.*) Workers' Compensation would no longer pay for pain medication, and Hanson either refused or was ineligible for surgery due to his obesity, so he had been living through the pain unassisted. (*Id.*) The diagnosis at this point was acquired spondylolysis at L5-S1. (*Id.*) The examining physician also declared that Hanson would improve no more without surgery. (*Id.*) He also noted that Hanson was at a permanent light duty. (*Id.*)

### 8. Gozi Health Services

On June 16, 2007, Hanson was examined by Dr. Afiz Taiwo for the purposes of providing information to the Bureau of Disability Determination Services to determine the extent of his disability. (R. 583). Dr. Taiwo determined that the claimant still suffered from lumbar radiculopathy with acute back pain. (R. 583, 586). Dr. Taiwo also noted that physical therapy had not led to any improvement and that claimant had been told he could not have surgery due to his obesity. (R. 583). He characterized Hanson as "reliable" and stated his pain was a "10/10, short and constant, radiating to the lateral aspect of the leg." (*Id.*) With respect to his activities, Dr. Taiwo's report states that Hanson is able to "walk for 5 minutes, stand for 10 minutes, and sit for 30 minutes with pain referred to the back." (R. 584). He can lift, pull and push 20 pounds, but he has difficulty cleaning (vacuuming, sweeping or mopping). The report also states that Hanson has difficulty putting on his own pants and socks, and that he is able to drive for 15 minutes. (*Id.*)

Dr. Taiwo's report also noted that Hanson was able to walk greater than 50 feet without support and could get on and off the exam table with no difficultly. (R. 585). The range of motion in Hanson's cervical spine was not limited, but there was tenderness

along the spine.  He had flexion of 80 degrees with pain, extension of 10 degrees with

pain, and a straight leg raise test was positive on the right side.  (*Id.*) He noted that

Hanson was pleasant throughout the examination, and "overall effort and cooperation

were excellent."  (*Id.*)

## C. Claimant's Testimony

Hanson was born on May 28, 1951.  (R. 11).  At the time of the hearing, he was 6

0" tall and weighed 360 pounds.  (*Id.*)  Hanson is married with a high school diploma,

but no other formal education.  (R. 12).  He lives with his wife in a home in Morris,

Illinois.  (R. 11).  At the time of the hearing, he was not working.  (R. 12).

Hanson alleges disability beginning on July 5, 2005.  (R. 45).  In the years prior

to his alleged disability, Hanson held a number of jobs.  Hanson testified that he worked

as a warehouseman, window maker, forklift operator, press operator, and maintenance

mechanic supervisor.  (R. 28-29).

Most recently, Hanson held a temporary position at a nuclear plant where he

monitored the work of carpenters, electricians, and other laborers and reported to their

supervisors.  (R. 29-30). This job was only temporary, and he was not required to lift

anything, although it did require some walking.  (*Id.*)  The vocational expert

characterized this job as a "quality control inspector."  (*Id.*)

Before his temporary position at the nuclear plant, Hanson worked in

maintenance and labor in a concrete factory.  (R. 12).  He left in August of 2005

because there was no longer a position for him.  (*Id.*)  Prior to this position, Hanson was

employed for six years as the working foreman press operator at Northwestern

Corporation.  (R. 12-13).  Since his injury in 2005, Hanson has not been able to secure

a job because of the pain in his back and the limitations on lifting. (R. 13).

Hanson testified that he is able to do some household tasks. Due to her own health issues, Hanson's wife needs his assistance getting in and out of a wheelchair and into the bath or the car. (R. 14). Hanson does their dishes because his wife is unable. (*Id.*) Hanson testified that this can take him 3 hours to accomplish because he has to take a break and stretch his back over the sink. (R. 14-15). Afterwards, he needs to lie down to recover. (*Id.*) He does not do laundry, cook or use a computer at home. (R. 15). Hanson testified that occasionally he and his wife shop for groceries together. (R. 16). He also testified that he can mow the lawn with a push lawnmower, but what once took him 30 minutes now takes him 6 hours. (*Id.*) He also needs to take periodic breaks when driving. He testified that it should have taken just 40 minutes to drive to the administrative hearing but it actually took him 1.5 hours because he had to stop twice for 20 minutes to stand up and stretch. (R. 27). His wife helps him with personal needs that he cannot do on his own, such as shaving, combing his hair, tying his shoes and changing his socks. (R. 14, 19).

Hanson testified that he used to go fishing about once a week, but now he goes about once a month because he has difficulty walking. (*Id.*) He reads, watches television and occasionally plays guitar, but does not play video games, bingo or gamble. (R. 17-18). Hanson testified that he can only stand for 20 minutes at a time, he can sit for only 30-35 minutes at a time, and he can only lift up to 20 pounds if he is standing up. (R. 19). Since the accident, Hanson testified that he must lie down between six and seven hours each day to make the pain subside. (R. 26). Hanson also testified that he is unable to have back surgery because of his obesity. (*Id.*)

At the time of the hearing, Hanson testified that he was currently suffering from stabbing pain in his back, scoring it a 9 out of 10 (with 10 being pain bad enough to go to the emergency room). (R. 20). He stated that he usually gets this kind of pain when he has been standing or sitting for too long. (*Id.*) Hanson takes muscle relaxers once a day. (R. 21). He also takes medicine for his blood pressure, as well as Aleve. (*Id.*) He cannot obtain any other pain relievers because his doctor is at a free clinic where they do not prescribe narcotics. (*Id.*) In addition to these medications, Hanson has had eight injections for pain relief, which lasted about two days. (R. 25). He does get some pain relief from a hot bath, or from laying down. (R. 26).

Hanson also complained of pain in his right wrist that comes and goes. (R. 20-21). He characterized this as a six out of ten. (*Id.*) Hanson testified that at the time of the hearing, he might be able to pick up a pen on the table in front of him with his right hand and that he could definitely do so with his left. (R. 22). He also testified that he could not pick up a paper clip with either hand, and that every once in a while he had trouble using a fork or a knife. *(*R. 23).

Hanson testified that the functional capacity evaluation was about four hours long and he felt "like [he] got run over by a truck" when it was over. (R. 25). The next day, he was unable to get out of bed. (*Id.*)

### D. Vocational Expert's Testimony

Vocational Expert James Breen ("the VE" or "VE Breen") testified at the January 27, 2009 hearing. (R. 27-36). VE Breen described Hanson's past work experience as defined by the Dictionary of Occupational Titles ("DOT"). (R. 32). The VE classified Hanson's work at the nuclear plant as a quality control inspector and, according to the

DOT, that work is semi-skilled and requires light exertion. (*Id.*) Next, VE Breen looked at Hanson's past position as a warehouse worker and classified this work as unskilled and medium exertion. (*Id.*) The VE opined that Hanson's work as a maintenance supervisor would be classified as skilled and medium exertion. (*Id.*) His positions as forklift operator and window assembler would both be semi-skilled and medium exertion. (*Id.*) The VE determined that Hanson's work as a press operator was semi-skilled and heavy exertion. (*Id.*) Finally, the VE classified his work as a construction laborer as unskilled and very heavy exertion. (R. 33).

The ALJ asked the VE to "assume a person claimant's age, education, work experience and skill set who's able to lift up to 50 pounds occasionally, lift or carry up to 25 pounds frequently in medium work as defined by the Regulations, never climbing ladders, ropes or scaffolds, occasionally climbing ramps or stairs, occasionally balancing, occasionally stooping, occasionally crouching, occasionally kneeling, never crawling, avoiding concentrated exposure to all protected heights. Can an individual with these limitations perform claimant's past work as claimant performed it or as customarily performed?" (R. 33). VE Breen responded that such an individual would be able to perform Hanson's past work as a maintenance supervisor, warehouse worker, window assembler, and quality control technician, but not his other jobs. (R. 34).

The ALJ then reduced the exertion level from medium to light, in which the claimant could only "lift up to 20 pounds occasionally, lift or carry up to 10 pounds frequently." (*Id.*) VE Breen responded that only the quality control technician (Hanson's job at the nuclear plant) would fall under this category. (*Id.*) He gave several other examples of available positions in the national economy, such as mail clerk, cashier, or

fast food worker. (R. 35). Again the ALJ reduced the exertion level from light to sedentary, in which the claimant could only "lift up to 10 pounds occasionally." (*Id.*) To this, the VE responded that none of Hanson's previous work would fall under this category. (*Id.*)

The ALJ also asked the VE to assume that "due to a combination of medical conditions and associated pain an individual is unable to engage in sustained work activity on a regular and continuing basis for eight hours a day, five days a week for a 40-hour workweek or an equivalent work schedule." The ALJ then asked: "Is competitive work precluded for such an individual at all exertion levels?" (R. 35-36). VE Breen responded that it would be. (R. 36).

## II. LEGAL ANALYSIS

### A. Standard of Review

This Court will affirm the ALJ's decision if it is supported by substantial evidence and free from legal error. 42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F.3d 936, 940 (7th Cir. 2002). Substantial evidence is more than a scintilla of evidence; it is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Diaz v. Chater*, 55 F.3d 300, 305 (7th Cir. 1995) (*quoting Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971)). We must consider the entire administrative record, but will not "reweigh evidence, resolve conflicts, decide questions of credibility, or substitute our own judgment for that of the Commissioner." *Lopez v. Barnhart*, 336 F.3d 535, 539 (7th Cir. 2003) (*citing Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000)). This Court will "conduct a critical review of the evidence" and will not let the Commissioner's decision stand "if it lacks evidentiary support or an

adequate discussion of the issues." *Lopez*, 336 F.3d at 539 (*quoting Steele*, 290 F.3d at 940).

In addition, while the ALJ "is not required to address every piece of evidence," he "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872.  The ALJ must "sufficiently articulate [his] assessment of the evidence to assure us that the ALJ considered the important evidence ... [and to enable] us to trace the path of the ALJ's reasoning." *Carlson v. Shalala*, 999 F.2d 180, 181 (7th Cir. 1993) (per curiam) (*quoting Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985)).

## B. Analysis under the Social Security Act

In order to qualify for SSI or DIB, a claimant must be "disabled" under the Social Security Act (the "Act").  A person is disabled under the Act if "he or she has an inability to engage in any substantial gainful activity by reason of a medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 423(d)(1)(A).  In determining whether a claimant is disabled, the ALJ must consider the following five-step inquiry: "(1) whether the claimant is currently employed, (2) whether the claimant has a severe impairment, (3) whether the claimant's impairment is one that the Commissioner considers conclusively disabling, (4) if the claimant does not have a conclusively disabling impairment, whether he can perform past relevant work, and (5) whether the claimant is capable of performing any work in the national economy." *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001).  The claimant has the burden of establishing a disability at steps one through four. *Zurawski v. Halter*, 245 F.3d 881, 885–86 (7th Cir. 2001).  If the

claimant reaches step five, the burden then shifts to the Commissioner to show that "the claimant is capable of performing work in the national economy." *Id.* at 886.

The ALJ followed this five-step analysis in reaching his decision to deny Hanson's request for benefits. (R. 42–52). At step one, the ALJ found that Hanson "has not engaged in substantial gainful activity since July 5, 2005, the alleged onset date." (R. 47). At step two, he determined that Hanson has "discogenic and degenerative disorders of the spine, lumbar radiculopathy; obesity and hypertension," which are severe impairments. (*Id.*) At step three, the ALJ found that Hanson "does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1." (R. 48).

At step four, the ALJ examined Hanson's residual functional capacity ("RFC") in order to determine whether he could perform his past relevant work. (R. 48–51). He found that Hanson has the RFC to perform light work as defined in 20 C.F.R. 404.1567(b) and 416.967(b), except that he should avoid crawling or climbing ladders, ropes, or scaffolds. (R. 48). He also found that Hanson should be limited to occasional climbing of ramps and stairs, and occasional balancing, stooping, kneeling, or crouching. (*Id.*) The ALJ ultimately concluded that there is no convincing evidence that Hanson has been more limited than the RFC to perform light work for a period of 12 months or more since July 2005. (R. 51). Based on this determination, the ALJ found that claimant "is capable of performing past relevant work as a quality control inspector/technician." (R. 52).

Because the ALJ found that Hanson is able to perform his past relevant work, the ALJ determined that claimant "has not been under a disability, as defined in the Social

Security Act, from July 5, 2005 through the date of this decision," and Hanson's request for DIB and SSI was denied. (*Id.*)

Hanson now argues that the ALJ's decision was flawed. First, Hanson argues that the ALJ improperly determined that he did not medically equal a listing impairment at step three of the analysis. Hanson also argues that the ALJ erred in finding him capable of light work, and in making an adverse credibility determination regarding his pain. Finally, Hanson argues that the ALJ erred in determining that he could perform his past relevant work as a quality control inspector/technician. We address Hanson's arguments below.

## C. The ALJ's Step-Three Analysis was Insufficient

First, Hanson contends that the ALJ erred in step-three of the analysis in finding that his impairment does not meet or medically equal an impairment under Listing 1.04, which covers "Disorders of the Spine." Hanson contends that the ALJ ignored relevant medical evidence that establishes that he does in fact have an impairment that meets or is medically equal to a listed impairment. The Commissioner does not address this argument in his response brief.

As the ALJ noted, at step-three, there must be "objective medical findings" that correspond with one of the listed impairments. (R. 48). In his opinion, the ALJ stated, "[b]ased on objective medical evidence in the record and the DDS reviewers (Exhibit(s) 14F), I conclude that the claimant does not have an impairment or combination of impairments that meet or medically equal the requirements of any listed impairment...under Listing 1.04." (R. 48). The ALJ continued:

> Listing 1.04 is not met or medically equaled as the medical evidence of record fails to establish that the claimant has a *Disorders of the spine* (e.g., herniated

nucleus pulposes, spinal arachnoiditis, spinal stenosis, osteoarthritis,
degenerative disc disease, facet arthritis, vertebral factrue) with either evidence
of nerve root compression characterized by neuro-anatomic distribution of pain,
limitation of motion of the spine, motor loss (atrophy with associated muscle
weakness of muscle weakness) accompanied by sensory or reflex loss and, if
there is involvement of the lower back, positive straight-leg raising test (sitting or
supine)...[1]

(*Id.*)  Aside from this recitation of the language of Listing 1.04, the ALJ did not engage in

any other discussion at step-three.  Claimant argues that this cursory analysis was

insufficient.  We agree.

"In considering whether a claimant's condition meets or equals a listed

impairment, an ALJ must discuss the listing by name and offer more than a perfunctory

analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668-69 (7th Cir. 2004)

(finding the ALJ's "two-sentence consideration of the Listing of Impairments [was]

inadequate and warrants remand").  In particular, the ALJ is required to evaluate any

---

[1]The ALJ's opinion recited Listing 1.04 in its entirety, which is as follows:

1.04 Disorders of the spine (e.g., herniated nucleus pulposus, spinal
arachnoiditis, spinal stenosis, osteoarthritis, degenerative disc disease, facet
arthritis, vertebral fracture), resulting in compromise of a nerve root (including the
cauda equina) or the spinal cord. With:

(A)  Evidence of nerve root compression characterized by neuro-anatomic
distribution of pain, limitation of motion of the spine, motor loss (atrophy
with associated muscle weakness or muscle weakness) accompanied by
sensory or reflex loss and, if there is involvement of the lower back,
positive straight-leg raising test (sitting and supine);

(B)  Spinal arachnoiditis, confirmed by an operative note or pathology
report of tissue biopsy, or by appropriate medically acceptable imaging,
manifested by severe burning or painful dysesthesia, resulting in the need
for changes in position or posture more than once every 2 hours; or

(C)  Lumbar spinal stenosis resulting in pseudoclaudication, established
by findings on appropriate medically acceptable imaging, manifested by
chronic nonradicular pain and weakness, and resulting in inability to
ambulate effectively, as defined in 1.00B2b.

evidence of the required criteria that is favorable to the claimant. *Ribaudo v. Barnhart,* 458 F.3d 580, 584 (7th Cir. 2006) ("[the ALJ's] failure here to evaluate any of the evidence that potentially supported [claimant's] claim does not provide much assurance that he adequately considered [the] case"); *Brindisi v. Barnhart*, 315 F.3d 783, 786 (7th Cir. 2003) (remanding where ALJ failed to mention the strongest piece of evidence supporting an impairment). In addition, "[w]hether a claimant's impairment equals a listing is a medical judgment, and an ALJ must consider an expert's opinion on the issue." *Barnett*, 381 F.3d at 670.

Here, the ALJ failed to do *any* analysis with respect to his step-three finding. He did not address the fact that claimant had, in fact, been diagnosed with a disorder of the spine, namely, degenerative disc disease, stenosis and lumbar radiculopathy. Nor did he evaluate medical evidence that was relevant to the other criteria in Listing 1.04 and that was favorable to Hanson. Hanson's medical history revealed chronic pain, numbness and tingling, difficulty with flexion and extension, and several positive straight-leg raising tests. Instead of addressing this evidence, the ALJ simply recited Listing 1.04, and then cited to Exhibit 14F, which is the state residual function capacity report and which contains only a few lines about Hanson's medical condition. (R. 595). As a result, we find that the ALJ's step-three analysis was insufficient. *See Benford v. Astrue*, No. 11 C 4, 2011 WL 4396921, at *4 (N.D. Ill. Sept. 20, 2011) (remanding for further proceedings where the ALJ simply stated that the "claimant's lumbar radiculopathy did not meet/equal listings in section 1.00 (musculoskeletal system) because there was no evidence of...disorder of the spine, or any of the specific neurological deficits required under this section").

In reaching this conclusion, we do not render any opinion as to whether Hanson's ailments satisfy step-three of the analysis. We only find that the ALJ should have analyzed this issue with more detail, and we therefore remand for further proceedings.

**D.    The ALJ's Credibility Finding Regarding Hanson's Pain Requires Remand**

Hanson makes two additional (and related) arguments regarding the ALJ's opinion. First, he asserts that the ALJ erred in finding that Hanson had the residual functional capacity to perform light work. He also argues that the ALJ made an improper credibility determination. The gist of both of these arguments is that the ALJ failed to adequately consider the effects of Hanson's pain on his ability to work

When faced with a claimant's allegations of subjective symptoms, such as pain, the ALJ must make a credibility determination. *Dampeer v. Astrue,* -- F. Supp. 2d --, 2001 WL 5169448, at *9 (N.D. Ill. Oct. 21, 2011). "The ALJ's credibility determinations are entitled to special deference because the ALJ has the opportunity to observe the claimant testifying." *Jones v. Astrue,* 623 F.3d 1155, 1160 (7th Cir. 2010). Accordingly, we reverse credibility determinations only if they are "patently wrong." *Id.*

Despite this "special deference," the ALJ is still required to articulate his reasoning and discuss or distinguish any relevant contrary evidence. *Clifford*, 227 F.3d at 870. "Thus, although the ALJ need not discuss every piece of evidence in the record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling." *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003) (citations omitted). "Otherwise it is impossible for a reviewing court to tell whether the ALJ's decision rests upon substantial evidence." *Id.* A determination of credibility "must contain specific

reasons for the credibility finding" in order to allow the reviewing body to understand the reasoning. *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008).

In evaluating and assessing complaints of disabling pain, the ALJ must also follow the requirements of Social Security Ruling ("SSR") 96–7p. *Brindisi*, 315 F.3d at 787. SSR 96–7p requires an ALJ to consider the entire case record when evaluating an individual's credibility. *See* 20 C.F.R. § 416.929. In addition, the ALJ cannot "disbelieve [a claimant's] testimony [regarding pain] solely because it seems in excess of the 'objective' medical testimony." *Johnson v. Barnhart*, 449 F.3d 804, 806 (7th Cir. 2006); *see also Benford*, 2011 WL 4396921, at *5-6 ("a person's subjective experience of pain is notoriously hard to gauge from the outside"). Claims of severe pain can be credible even if they are unsupported by significant physical and diagnostic examination results. *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004).

In finding that Hanson was capable of performing light work, the ALJ stated: "After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent that they are inconsistent with the above residual functional capacity assessment." (R. 49-50). Following this boilerplate language, the ALJ added: "[t]he claimant has described daily activities which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. Also, despite the complaints of allegedly disabling symptoms, the claimant has not taken any medication for those symptoms." (R. 50).

We conclude the ALJ's determination regarding Hanson's credibility was flawed

for several reasons.  At the outset, we note the ALJ concluded, without any analysis,

that claimant's statements regarding the intensity, persistence and limiting effects of his

symptoms were not credible to the extent that they were inconsistent with the RFC

determination.  (R. 50).  The ALJ did not explain which of Hanson's statements he

found not credible, nor did he specify his reasons for this finding.  Under SSR 96-7p,

an ALJ's determination or decision regarding claimant credibility "must contain specific

reasons for the finding on credibility, supported by the evidence in the case record, and

must be sufficiently specific to make clear to the individual and to any subsequent

reviewers the weight the adjudicator gave to the individual's statements and the

reasons for that weight."  The ALJ's perfunctory analysis here fails to comply with this

provision and Seventh Circuit precedent.  *See, e.g., Martinez v. Astrue,* 630 F.3d 693,

696 (7th Cir. 2011); *Brindisi,* 315 F.3d at 787–88; *Zurawski,* 245 F.3d at 887.

Even beyond this deficiency, it appears from the ALJ's analysis that his

credibility finding was based on two factors: 1) Hanson's daily activities, which the ALJ

did not believe were consistent with his claim of disabling pain; and 2) his failure to take

pain medication.  As set forth in more detail below, we find that the ALJ's reliance on

both of these factors was patently wrong, and as such, we remand for further

proceedings.

## 1. Hanson's Daily Activities

The ALJ improperly relied upon Hanson's daily activities in making his credibility

finding and discrediting Hanson's alleged pain for several reasons.  First, the ALJ

misstated Hanson's testimony regarding these activities.  The ALJ's opinion states that

Hanson "can perform various household chores (*i.e.* mowing the lawn, cooking, and

laundry) and care for his personal needs, but has to periodically take rest breaks." (R. 49). This is not an accurate characterization of Hanson's testimony. In fact, Hanson stated that he does not do the laundry or cook, and that he cannot take care of his personal needs; he said he cannot put on his own shoes and socks and his wife helps with combing his hair and shaving. (R. 14-15). He also stated that although he can mow the lawn, what once took him 30 minutes to do, now takes him 6 hours. (R. 16). The ALJ also stated "[h]e has reported that he cannot perform any kind of exercise but stated that he fishes." (R. 49). However, Hanson testified that in the past he would go fishing once a week, but now he goes only once a month because he has difficulty walking. (R. 17). Based on these inconsistencies, we find that the ALJ improperly overstated Hanson's daily activities as a basis for discrediting his claim of disabling pain.

We also find that the ALJ failed to adequately explain how Hanson's daily activities would justify an RFC to perform light work. For example, the ALJ acknowledged Hanson's testimony that he "usually has to alternate between sitting and standing, or lie down in order to lessen the pain," and that he has to take periodic breaks when performing household chores or caring for personal needs. (R. 49). The ALJ then failed to discuss how these conditions could be consistent with workplace demands. The Seventh Circuit has repeatedly held that the ability to accomplish simple household activities does not necessarily qualify a claimant for full-time employment outside the home. *See Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006) ("we have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a

job outside the home"); *Gentle v. Barnhart*, 430 F.3d 865, 867 (7th Cir. 2005) (ALJ's

"casual equating of household work to work in the labor market" could not stand);

*Carradine,* 360 F.3d at 755–56 (ALJ improperly "failed to consider the difference

between a person's being able to engage in sporadic physical activities and her being

able to work eight hours a day five consecutive days of the week").

        Moreover, we do not find Hanson's description of his daily activities to be

inconsistent with disabling pain.  Although Hanson testified that he could wash dishes,

he also testified that it took him 1 hour and he had to lie down afterwards.  He also

stated that he could drive but had to stop frequently to stand up and stretch his back.

The Seventh Circuit has held that minimal daily activities such as occasional cooking,

dish washing, or grocery shopping should not discredit a claimant's testimony

regarding disabling pain.  *See Carradine*, 360 F.3d at 755-56 (the ability to occasionally

shop, drive, do housework and take walks did not discredit claimant's testimony

regarding disabling pain); *Zurawski,* 245 F.3d at 887 (claimant's washing dishes,

helping children prepare for school, doing laundry and preparing dinner were not

necessarily inconsistent with a claim of disabling pain).

        We also find that the ALJ failed to adequately consider evidence in the record

that supports Hanson's complaints of severe and disabling back pain.  (*See e.g.*, R.

238, 283, 390, 396, 525, 548, 551).  For example, Dr. Afiz Taiwo, the state agency

consultant, reported that Hanson's pain was 10/10 and that he can walk for 5 minutes,

stand for 10 minutes and sit for 30 minutes "with pain referred to the back."  (R. 584).

Dr. Taiwo characterized Hanson as "reliable."  (R. 583).  He also noted that he cannot

vacuum, sweep or mop due to his pain, and that the pain "is aggravated with standing,

walking, sitting and bending." *Id.* In addition, Hanson's physical therapist also reported that Hanson experienced severe pain during the therapy sessions and that, although he may show improvement with continued therapy, "pain might be prohibitive." (R. 248). While the ALJ is not required to analyze every piece of evidence, here it appears that the ALJ only addressed the medical evidence favoring the denial of benefits. The ALJ's decision makes it difficult for us to discern whether he considered the record as a whole. The apparent failure to consider evidence that favors Hanson's claim for disability is grounds for remand. *Zurawski,* 245 F.3d at 888-89 (remand warranted where ALJ did not refer to medical evidence that supported claimant's claims of disabling pain); *see also Ribaudo*, 458 F.3d at 584-85.

### 2. Hanson's Failure to Take Medication

Next, the ALJ erred in relying on the fact that Hanson has not taken any pain medications as a basis for undercutting his credibility. (R. 50). SSR 96–7p precludes an adjudicator from drawing any inferences about an individual's symptoms from a failure to seek or pursue regular medical treatment "without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment." *See Craft v. Astrue*, 539 F.3d 668, 679 (7th Cir. 2008). Indeed, "[a]n inability to afford treatment is one reason that can provide insight into the individual's credibility." *Id.* Here, the ALJ ignored Hanson's testimony that he has been taking muscle relaxers once a day, and that he has not been taking any other pain medication because "they don't give out narcotics at the free clinic." (R. 21). The failure to consider this evidence in connection with his credibility determination is also grounds for remand. *Craft,* 539 F.3d at 679 (remanding because, among other things, the ALJ

drew a negative inference from claimant's lack of medical care, but failed to consider evidence that the claimant could not pay for regular treatment and medication).

In conclusion, we do not make any determination as to whether Hanson is entitled to benefits. In reaching our decision, we only find that the ALJ's decision was flawed in that it failed to consider certain contrary evidence. As we stated at the outset, the ALJ "is not required to address every piece of evidence," but "must build an accurate and logical bridge from the evidence to his conclusion." *Clifford*, 227 F.3d at 872. This requires that he "articulate [his] assessment of the evidence" so that we can "trace the path of the ALJ's reasoning." *Carlson*, 999 F.2d at 181. We find that the ALJ failed to meet this standard with respect to the issues discussed above, and we remand for further proceedings. The ALJ is directed to reconsider whether Hanson meets the conditions in step-three of the analysis, and if necessary, to reevaluate Hanson's credibility and his RFC level. In light of this finding, we need not address Hanson's remaining arguments regarding steps four and five at this time.

## III. CONCLUSION

For the reasons set forth above, Hanson's motion for summary judgment is granted and the Commissioner's cross-motion for summary judgment is denied. This case is remanded to the Social Security Administration for further proceedings consistent with this Opinion. It is so ordered.

_____
Michael T. Mason
United States Magistrate Judge

Entered: January 30, 2012